**ALGERNON BLAIR GROUP, INC., etc., and Algernon Blair Group Inc., d/b/a Colony Associates Joint Venture, Plaintiffs-Appellees,**

v.

**UNITED STATES FIDELITY AND GUARANTY COMPANY, etc., Defendant-Appellant,**

**Turner Insurance & Bonding Co., Inc., Defendant.**

No. 86–7611.

United States Court of Appeals, Eleventh Circuit.

July 15, 1987.

Gary A. Brewer, Brewer, Krause & Brooks, Nashville, Tenn., James W. Garrett, Jr., Rushton, Stakely, Johnston & Garrett, P.A., Montgomery, Ala., for defendant-appellant.

James A. Byram, Jr., Steiner, Crum & Baker, Walter R. Byars, Montgomery, Ala., for plaintiffs-appellees.

Before HILL and JOHNSON, Circuit Judges, and HENLEY[*], Senior Circuit Judge.

HILL, Circuit Judge:

USF & G insured a block of three buildings owned by appellee, Algernon Blair Corp, Inc. ("Algernon") for $5,000,000. The buildings were located next to each other on a single block in Nashville, Tennessee. On October 12, 1985, the property was substantially damaged by a fire. Algernon Blair notified its insurance carrier, U.S. Fidelity and Guaranty ("USF & G"), of the loss. Two days later, on October 14, an on-site meeting took place between Algernon officials, Mr. James M. Anglea, supervisor of building inspections for the Metropolitan Government of Nashville and Davidson County, ("Metro Government") representatives of the Nashville Fire Department, and a claims adjuster representing USF & G. At the meeting Mr. Angela

[*] Honorable J. Smith Henley Senior U.S. Circuit Judge for the Eighth Circuit, sitting by designation.

advised the parties that the subject property was so substantially damaged as to constitute a health hazard to the public. Accordingly, he ordered Algernon to barricade the area and to demolish the remaining structures. He followed up this verbal order with a letter dated October 14, 1985. The pertinent parts stated as followed:

As the result of a recent fire at the above referenced location, it has been determined by a visual inspection made by this department on October 14, 1985 that the buildings are substantially damaged and a hazard to the public.

You are therefore notified to demolish the remaining structures, and further to make safe the area by barricades or other methods approved by this department before any work begins.

This demolition should begin not later than October 28, 1985, and be completed within ninety (90) days. Furthermore, there exists dangerous conditions caused by partial collapse of some walls leaving other high standing walls that need to be leveled to the ground immediately. You are directed to correct these conditions as soon as possible but not later than October 28, 1985.

Algernon promptly employed a wrecking company to barricade the area and begin demolition of the remaining structures.

On October 18, 1985, prior to the commencement of any demolition work, USF & G obtained a temporary restraining order from the Chancery Court for Davidson County, Tennessee. The order temporarily forbade Algernon, the wrecking company, or the local government authorities from "destroying, tearing down, moving, or tampering with the structures remaining or rubble remaining as a result of the fire," so as to enable USF & G to complete its investigation. By its terms, the restraining order remained in effect from October 18 to October 25.

In obtaining this *ex parte* TRO, USF & G contended that the buildings were not in danger of collapse and that they did not constitute a hazard to the safety of the public. However, USF & G did not challenge the validity of the Metro Government

demolition order, nor did it seek to stay the demolition beyond the expiration of the TRO on October 25. Moreover, USF & G never requested Algernon Blair to resist or challenge the Metro demolition order, to appeal it, or to take any action to have the Metro Government's demolition order rescinded.

On October 24, Algernon Blair submitted a letter to USF & G which stated in relevant part:

Please regard this letter as the proof of loss by Algernon Blair Group, Inc. and a formal demand for payment by U.S.F. & G in the amount of $5,000,000 for the total loss of the property which U.S.F. & G insured in Nashville, Tennessee. If you wish us to supplement this proof of loss on some form from your company, please promptly furnish us with your form.

The Nashville Supervisor of Building Inspections has determined that the remaining structures "are a hazard to the public" and ordered that we "demolish the remaining structures, and further to make safe the area by barricades...." Your company has secured an order from the Nashville court restraining us and the City and our demolition contractor from doing this work. Of course, if any person is injured or property is damaged as a result thereof, we regrettably have to expect your company ... to indemnify us completely....

On October 25, the date on which the restraining order would expire, USF & G informed the other parties that it would not seek an extended injunction.

At this point a new group entered the controversy. Representatives of Historic Nashville, Inc. told the court handling USF & G's TRO that they were prepared to file a lawsuit of their own, or to intervene in USF & G's lawsuit, to prevent demolition of the facades of the burned structures. The preservation group felt that the facades facing on Second Avenue were of historical significance.

In order to avoid this additional complication, the Metro Government agreed to take out a temporary $1,000,000 liability policy

to protect Algernon Blair from any harm caused to the public by the hazard its buildings created. The Metro Government then gave the preservation group until November 6 to raise enough money to make the facade structurally sound. However, during this time the Metro Government's demolition order remained in effect, so Algernon began to clear the remains of the burned structures, other than the facades. When Historic Nashville failed to raise the necessary funds by November 6, Algernon Blair completed the demolition of all remaining structures, including the Second Avenue facades.

By letter dated November 7, USF & G informed Algernon Blair that its letter of October 24 was insufficient as a proof of loss, and asked Algernon to submit a USF & G form for proof of loss. Appellant complied with this request on or about November 19, again making a claim for the $5,000,000 face amount of the policy. In response to this demand, USF & G offered Algernon Blair $3,205,000, which it contended was the full amount of the loss sustained. This offer was rejected, and Algernon Blair filed suit in state court to recover the full amount of the policy. The case was then removed to federal district court for the middle district of Alabama. The district court granted summary judgment in favor of Algernon Blair. In a separate order dated August 18, 1986, the court awarded Algernon prejudgment interest pursuant to Tennessee laws. USF & G now appeals.

## DISCUSSION

Neither party contests the fact that if the subject property was a total loss then USF & G owes Algernon the full value of the $5,000,000 policy. The question raised on this appeal is whether the Metro Government's demolition order rendered the subject property a constructive total loss at law.

According to the documents filed in district court, at that level USF & G argued that the Metro Government erred in determining that the buildings were a total loss. Second, USF & G argued that the Metro Government did not have the legal authority to order Algernon to demolish the remaining structures on the subject property. USF & G contended that the local government was only empowered to give the property owner a choice of repairing the building commensurate with safety requirements or demolishing them. This argument was based wholly on USF & G's construction of the municipal regulations authorizing the Metro Government to order demolitions of partially destroyed structures. Finally, USF & G urged the district court to find that, as a matter of construction of the insurance contract, and pursuant to certain provisions of the code of the City of Nashville, Algernon had the duty to appeal and/or otherwise test the validity of the demolition order before it could recover under the policy.

The district court decided in favor of Algernon on each of these points. The court further determined that, although Tennessee law had not yet addressed the issue, the law of most jurisdictions seemed to be that a municipal demolition order creates a "total loss at law" in the type of circumstances presented here. *See e.g., Stahlberg v. The Travelers Indemnity Co.,* 568 S.W.2d 79, 84 (Mo.App.1978); *Maryland Cas. Co. v. Frank,* 85 Nev. 209, 452 P.2d 919 (1969); 6 Appelman, *Insurance Law & Practice,* § 3822 at 218 (1972). It therefore rendered summary judgment in favor of Algernon, because under Tennessee's "valued policy" law, T.C.A. § 56–7–801 *et seq.,* an insured who suffers a total loss of his insured property is entitled to the full amount of the policy coverage.

On appeal, USF & G contends that the district court implicitly drew inferences and made findings of fact in granting Algernon's motion for summary judgment, and therefore usurped the role of the jury. The main thrust of appellant's argument is that the court erred by failing to "find" that the Metro Government rescinded its demolition order when it gave Historic Nashville the opportunity to explore the possibility of preserving the Second Avenue facades of the buildings. In addition, appellant claims that the district court erro-

601

neously awarded prejudgment interest to Algernon Blair.

**ISSUE I:** Did the trial court erroneously weigh conflicting evidence and decide issues of material fact?

In reviewing an award of summary judgment, this court must apply the same standard as the district court. *Morrison v. Washington County, Ala.,* 700 F.2d 678, 682 (11th Cir.1983). Summary judgment should be entered only when the moving party has sustained its burden of showing the absence of a genuine issue as to any material fact when all the evidence is viewed in the light most favorable to the nonmoving party. *Sweat v. Miller Brewing Co.,* 708 F.2d 655, 656 (11th Cir.1983); *Williams v. City of Dothan, Ala.,* 745 F.2d 1406, 1410 (11th Cir.1984).

USF & G argues that the district court drew material inferences and reached conclusions on subjects about which reasonable minds could differ in granting summary judgment to Algernon. First, it argues that the judge erred by making an unauthorized finding of fact in determining that Mr. Angela invoked the Metro Government's power to order demolition of unsafe buildings under Nashville Ordinance § 11-1-71, governing demolitions in emergencies, and section 11-1-68, the non-emergency provision.[1]

Even if this is true, appellant does not explain why it is relevant on appeal. The district court further determined that under *either* the emergency or the nonemergency provision the director of codes administration had the authority to order demolition without first giving the owner of the buildings a choice of repairing the buildings or demolishing them. The court's decision on this matter was based entirely on its construction of the relevant statutes and regulations, giving proper deference to the municipal administrator's interpretation of the ordinances. The court found no legislative history giving a contrary interpretation.

On appeal, USF & G does not challenge the district court's interpretation of these ordinances. Thus, the district court's conclusion of law renders appellant's factual argument irrelevant. The court did reach a conclusion regarding which provision was invoked to support Mr. Angela's actions, *i.e.,* both provisions. However, even if this could be termed a "finding of fact," it does not change the fact that under both code sections the Metro Government had the authority to issue the demolition order without giving Algernon the choice to repair rather than demolish the buildings. The order required demolition. USF & G presents no reversible error on this issue.[2]

1. The provisions stated in relevant part:
    Sec. 11-1-68. Notice to repair, demolish, vacate, etc., unsafe buildings. (a) Whenever the director of codes administration shall find any building or structure or portion thereof to be unsafe, as defined in this article, he shall, in accordance with established procedures for legal notices, give the owner, agent or person in control of such building or structure written notice stating the defects thereof. Such notice shall require the owner or agent thereof, within a stated time, either to complete the specified repairs or improvements or to demolish and remove the building or structure or portion thereof.
    Sec. 11-1-69. Right of appeal of owner. The owner, agent or person in control of a building or structure declared unsafe under this article shall have the right, except in cases of emergency, to appeal from the decision of the director of codes administration and to appear before the board of building code appeals at a specified time and place to show cause why he should not comply with any

notice issued pursuant to the preceding section. (64-348, § 1).
    Sec. 11-1-71. Action by director of codes administration in cases of emergency. The decision of the director of codes administration shall be final in cases of emergency, without notice to the owner, which in his opinion involve imminent danger to human life or health. The director shall immediately cause such building, structure or portion thereof to be made safe or removed. For this purpose, the director may enter at once such building or structure or the premises upon which the same is located, or abutting land or structures, with such assistance and at such cost as he may deem necessary. He may vacate adjacent structures and protect the public by appropriate barricades or such other means as may be necessary, and for this purpose may close a public or private street, alley or means of access. (64-348, § 1).

2. The only conceivable relevance that this argument may have, though not pointed out by ap-

Next, USF & G objects to the fact that the court accepted as true the findings of Mr. Angela in determining that the structure constituted a public hazard and thus needed to be demolished. USF & G contends that this issue should have been left to the jury.

■ This argument presents nothing more than a collateral attack on the Metro Government's order to demolish the buildings. USF & G should have made this argument in state court during its (abandoned) attempt to get an injunction challenging the demolition order. USF & G had standing to challenge the demolition order; in fact it obtained a TRO. It could have disputed the factual findings of the Metro Government code administrator at that time by pursuing a preliminary injunction; it chose not to do so. Instead, it has waited until after the property has been demolished to challenge the correctness of the order. We agree with the district court that the validity of the Metro Government's demolition order may not be challenged at this late date.[3] *See e.g. Gambrell v. Cambellsport Mutual Ins. Co.*, 47 Wis.2d 483, 177 N.W.2d 313 (1970); *Maryland Casualty Co. v. Frank*, 452 P.2d at 921 (condemnation order, unchallenged before the local authorities, is conclusive in court and sufficient to support a finding of total loss).[4]

**ISSUE II:** Did the metro government rescind the demolition order?

On appeal, USF & G also argues that the district court disregarded evidence which indicated that the Metro Government rescinded its own demolition order when it gave Historic Nashville a chance to preserve the facades of the subject property. It argues that once the Metro Government gave Historic Nashville the opportunity to make the facades structurally sound, Algernon Blair then had a choice to destroy all of the buildings or preserve part of them. Because Algernon "chose" to destroy the structures, USF & G contends it is not entitled to receive the full value of the insurance policy.

Algernon rightly notes that this argument is brand new on appeal. While the facts used by USF & G to make the argument may have been in the record at the point when summary judgment was granted, the argument that it presents on appeal was quite simply never made to the district court. U.S. Fidelity admits as much. In fact, in its statement regarding oral argument, USF & G requested oral argument because, "the facts apparently not considered by the trial judge present an element of defense to USF & G not previously briefed and not argued before the trial judge." However, it claims that it is entitled to make an argument "from a slightly different angle" because the argument is

---

pellant, is that the property owner has a right to appeal under the nonemergency provisions and not under the emergency provision. *See* § 11–1–69, quoted at n. 1, *supra.* However, this distinction makes no difference in light of the court's finding that, as a matter of law, Algernon had no *duty* to appeal the demolition order before it could recover. In fact, on appeal USF & G does not challenge this well-supported aspect of the district court's order. The argument is thus deemed abandoned. *Roberts v. Wainwright*, 666 F.2d 517, 518 (11th Cir.1982), *cert. denied*, 459 U.S. 878, 103 S.Ct. 174, 74 L.Ed.2d 143.

**3.** In district court USF & G argued that Algernon had the duty to appeal the demolition order in order to recover. As noted above, it has abandoned this argument on appeal.

**4.** In attempting to prove that a municipal demolition order does not conclusively establish a constructive total loss, appellant cites three

cases in which the insurer was allowed to challenge such an order in court, those being *Kotlarsky v. Fidelity Union Fire Ins. Co.*, 137 Kan. 609, 21 P.2d 305 (1933); *Security Ins. Co. v. Rosenberg*, 227 Ky. 314, 12 S.W.2d 688 (1929); and *Glens Falls Ins. Co. v. Peters*, 386 S.W.2d 529 (Texas 1965). However, each of these cases is easily distinguishable. In *Security* and *Glens Falls*, the insurers had no notice of the demolition order, and were thus unable to challenge it. Here, USF & G was well aware of the Metro Government's order, and did challenge it to the extent of obtaining a TRO.

In *Kotlarsky*, the condemnation order was solicited by the insured. Where an insured acts in collusion with municipal authorities to increase a fire loss from partial to total via the issuance of a demolition order, the insurer has a claim very different from the one presented by USF & G. Here USF & G did not even contend that Algernon Blair sought or welcomed the Metro Government's demolition order, and no evidence was presented to that effect.

based on facts at the trial judge's disposal at the time that it rendered summary judgment.

■ This argument ignores case law to the contrary, which clearly states that factual assertions to defeat summary judgment may not be presented for the first time on appeal. *Denis v. Liberty Mutual Insurance Co.*, 791 F.2d 846, 849 (11th Cir.1986); *DeBardeleben v. Cummings*, 453 F.2d 320, 324 (5th Cir.1972). In an attempt to save itself USF & G maintains that its previous argument concerning the Metro Government's authority to issue a binding demolition order presented the same issue. This contention ignores the fact that the trial judge's decision on that issue was entirely based on a construction of Tennessee law, while the argument made on appeal rests entirely on a possible interpretation of the facts of the case. The argument comes too late.

■ Even if the argument is not new (which it is) the record clearly shows that the demolition order was never rescinded. Algernon cites deposition testimony of Mr. Angela himself, who indicated that he never changed his opinion that the buildings were unsafe and needed to come down. The fact that the Metro Government tried to appease the Historic Nashville preservation group by giving Historic Nashville the opportunity to try to make the buildings structurally sound, because they were not structurally sound, did not change the fact that Metro was of the opinion that the building was unsafe and needed to be demolished. Algernon did not have a "choice;" legally, it was required by the Metro Government to destroy the buildings. The record presents no issue of material fact on this point.

**ISSUE III:** Was prejudgment interest correctly awarded?

USF & G argues that under Tennessee law the district court abused its discretion in awarding prejudgment interest because the amount of the dispute was not "liquidated." They base this argument on Tennessee Code Section 47–14–109, which reads:

Liquidated and settled accounts, signed by the debtor, shall bear interest from the time they become due, unless it is expressed that interest is not to accrue until a specific time therein mentioned.

Algernon argues that interest was correctly awarded, both as a matter of right under section 47–14–109 and as a matter of discretion under code section 47–14–123. The latter section reads:

Prejudgment interest ... may be awarded by courts or juries in accordance with the principles of equity at any rate not in excess of a maximum effective rate of 10% per annum.

The district court found that because Algernon sued on the full amount of the policy, claiming a total loss, the amount of the dispute was set by law (by virtue of Tennessee's valued policy law) at $5,000,000. Therefore the sum was liquidated, *i.e.*, it was $5,000,000. The judge thus awarded prejudgment interest.

■ We have discovered no case law defeating such an interpretation of § 47–14–109. The lawsuit did not concern Algernon's right to a lesser sum; it was to determine whether the company was entitled to the full amount of the policy. Moreover, appellant offers no reason why the interest could not be awarded as an exercise of judicial discretion under 47–14–123, which is not restricted to liquidated amounts. We thus affirm the court's award of prejudgment interest; the court did not abuse its discretion.

**ISSUE IV:** Date of Accrual.

Under the terms of the policy the amount of loss for which USF & G could be liable was payable 60 days after receipt of the insured's "proof of loss". By law prejudgment interest begins to accrue from the day that the loss becomes payable.

USF & G claims that the letter it received from Algernon on October 24 letter was insufficient as a proof of loss, and that the 60 day period for payment began to run on November 20, the day after USF & G received its own proof of loss form. Algernon claims that the 60 day period began to

run on October 28 when USF & G received Algernon's letter of October 24, (quoted above).

The district court found that prior to the company's demand that Algernon submit a formal proof of loss, USF & G had already investigated the fire and received all the information necessary to process a claim. The court found, "although defendant ultimately insisted upon receiving a formal proof of loss, such was a vain and useless act serving only to furnish a technical ground to delay payment until the proscribed form was completed and filed with USF & G's office." Thus, the court concluded that the October 24 letter was sufficient as a proof of loss *given the surrounding facts and circumstances.* The judge therefore determined that the 60 day period began to run on October 28, with prejudgment interest accruing as of December 27, 1985.

■ Appellant maintains that the letter of October 24th fell far short of what their contract required for a proof of loss. We agree. Algernon's policy required that the proof of loss be "signed and sworn to," and contain a variety of details not addressed in the letter of October 24, including, *inter alia,* a list of any encumbrances on the property; a description of any changes in use or occupation of the property; and the time and origin of the loss. While it may be true that USF & G did receive this information from various sources prior to Algernon's filing of a formal proof of loss, the requirements of the policy are quite clear, and were not met. The judge's finding in this regard was clearly erroneous. We therefore reverse the district court's August 18th order, in part, and hold that while the court did not abuse its discretion in awarding prejudgment interest, USF & G did not receive sufficient proof of loss until November 19, 1985. We therefore remand this single issue with instructions that the interest be awarded must be recalculated, accruing as of January 17, 1986. In all other respects, the judgment of the district court is affirmed.

AFFIRMED in part; REVERSED and REMANDED in part, with instructions.